**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES** | : | |
| **AND EXCHANGE COMMISSION,** | : | |
| | : | **Case No. 2:16-CV-36** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **ROBERT B. CROWE,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This case comes before the Court on Defendant Robert B. Crowe's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). The United States Securities and Exchange Commission ("SEC") filed a four-count complaint against Robert B. Crowe, alleging violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), Rule 10b-5 thereunder, and Section 17(a) of the Securities Act of 1933 ("Securities Act").[1] In his Motion to Dismiss the SEC's complaint, Defendant raises the following arguments: (1) that his conduct does not fall under the Adviser's Act Rule 206(4)-5, adopted to regulate "pay-to-play" schemes involving state pension funds; (2) that the SEC's complaint belongs in state, not federal, court, under state election laws rather than federal securities laws; (3) that the SEC failed to allege fraud "in connection with" a securities transaction; and (4) that the SEC inadequately pled scienter, as required for its aiding and abetting claims. As explained below, Mr. Crowe's arguments lack merit. Accordingly, the Court **DENIES** his Motion to Dismiss the SEC's complaint for failure to state a claim.

---

[1] The Court will refer to each of these provisions as "Section 10(b)", "Rule 10b-5", and "Section 17(a)", respectively.

# I.  BACKGROUND

## A.  Factual History

This action concerns a purported "pay to play" scheme by a financial firm seeking to win business from the State of Ohio.  (Compl., Doc. 1, at ¶¶ 1-2.)  The Ohio Treasurer is the custodian of certain state funds' assets, including the assets of four Ohio public pension funds: the Ohio Police and Fire Pension Fund, the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, and the School Employees Retirement System of Ohio. (*Id.* at ¶¶ 2-3; Ohio Rev. Code § 113.051(A)).  Custodial services include, "among other things, receiving and delivering cash and securities for the pension funds, safekeeping the funds' assets, securities transaction settlement, income collection, and recordkeeping[,]" in addition to "investing the funds' daily cash balances into money market mutual funds or other short-term investment securities."  (Compl., Doc. 1, at ¶ 4.)

The Ohio Treasurer does not perform these custodial services itself; rather, under Ohio law, the Treasurer contracts with Ohio banks to do so ("Custodian Banks").  (*Id.* at ¶ 3.)  Because Ohio Custodian Banks cannot provide custodial services for international investment assets, and because each of the four pension funds holds such assets, the Ohio Treasurer directs the Ohio Custodian Banks to subcontract with banks that *can* provide these custody services ("Subcustodians" enter into the subcontracts, or "Global Custody Contracts").  (*Id.*)  The Ohio Treasurer selects Subcustodians through a bidding process "structured to be awarded solely on the basis of the submitted bids."  (*Id.* at ¶ 30.)  In January 2010, the Treasurer, Kevin Boyce, solicited bids for Subcustodians via a Request for Information on the Treasurer's website.  (*Id.* at ¶ 29.)  State Street Bank and Trust Company ("State Street"), assisted by its Senior Vice-President and head of Public Funds, Vincent J. DeBaggis, submitted a bid.  (*Id.* at ¶¶ 18, 29.)

A few weeks after Treasurer Boyce solicited bids, DeBaggis hired Mohamed Noure Alo, an immigration attorney and friend of Deputy Ohio Treasurer Amer Ahmad,[2] as a "lobbyist" for State Street.  (*Id.* at ¶¶ 19, 30, 31.)  DeBaggis knew that Alo had no lobbying experience; yet, on February 10, 2010, DeBaggis entered into a contract with Alo whereby State Street would pay him $8,000 per month.  (*Id.* at ¶ 32.)  If State Street won two or more Global Custody Contracts, State Street would pay Alo more.  (*Id.*)  Alo told DeBaggis, and later Mr. Crowe, "that he had to pay approximately half of these fees to Ahmad[,]" and that, in exchange, "Ahmad would award at least two of the Global Custody Contracts to State Street."  (*Id.* at ¶ 33.)  State Street paid Alo $16,000 on February 23, 2010, purportedly for two months' work.  (*Id.* at ¶ 34.)

The alleged kickbacks were not enough for Ahmad, however.  According to Alo, Ahmad also told State Street that it "needed to make significant cash contributions to Treasurer Boyce's election campaign fund."  (*Id.* at ¶ 35.)  By January 2010, Treasurer Boyce had raised significantly less money than his challenger, Josh Mandel.  (*Id.* at ¶ 27.)  If Boyce were not re-elected in November 2010, Ahmad would not be able to keep his job, and he would not be able to make money from illicit schemes.  (*Id.* at ¶ 26.)

State Street, upon learning of Ahmad's expectation, hired a well-known fundraiser and lobbyist, Mr. Crowe, who was the co-chair of the government relations practice at the law firm Nelson Mullins Riley & Scarborough, LLP ("Nelson Mullins").  (*Id.* at ¶¶ 15, 36-37.)  On March 3, 2010, Mr. Crowe met with Ahmad, among others, and described fundraisers and other ways in which he could help raise money for Treasurer Boyce's campaign.  (*Id.* at ¶ 37.)  Ahmad apparently did not have much interest in fundraisers; after the meeting, Ahmad cut to the chase and demanded from DeBaggis contributions of between $20,000 and $25,000 within five days.

---

[2] In May 2008, Ahmad was appointed Chief Financial Officer for the State of Ohio, and was appointed Deputy Treasurer in February 2009.  (Compl., Doc. 1, at ¶ 24.)

(*Id.*)  Mr. Crowe strategized with DeBaggis over how to meet Ahmad's demand, knowing: (a) the maximum campaign contribution limits for individual donors; (b) that an Ohio Treasurer's campaign would not be widely followed and Boyce was not widely known; and (c) that, without disclosing the conflict of interest, neither State Street nor Alo could contribute money to the Ohio Treasurer while also seeking business from him.  (*Id.* at ¶¶ 38-39.)

Mr. Crowe and DeBaggis then approached Alo and asked that Alo wire to Crowe the entire $16,000 services fee that he had received from State Street.  (*Id.* at ¶ 40.)  Alo protested; since he had to pay Ahmad half of his fee in kickbacks, the requested wire would put Alo in a deficit.  (*Id.* at ¶ 41.)  Crowe and DeBaggis convinced Alo to wire the $16,000, which he did on March 4, 2010, based on promises that Alo would recoup that money, and earn more, if Ahmad awarded State Street the promised Global Custody Contracts.  (*Id.* at ¶¶ 41-42.)

Mr. Crowe then wrote a check to Boyce's campaign for $11,300, the maximum individual campaign contribution limit, and asked other individuals to contribute in their own names.  (*Id.* at ¶ 43.)  He bundled his $11,300 check with a $3,000 check from a Crowe-controlled Nelson Mullins PAC and individual contributions from two Nelson Mullins employees.  (*Id.* at ¶ 44.)  The Nelson Mullins employees did not actually contribute their own money to Treasurer Boyce's campaign because Mr. Crowe reimbursed them via checks (dated March 5, 2010 and March 8, 2010, respectively) drawn on his personal bank account.  (*Id.* at ¶ 45.)  Five days after Ahmad's monetary demands, Mr. Crowe sent the four campaign contribution checks to Alo.  (*Id.* at ¶ 44.)   Alo forwarded the checks to Boyce's campaign committee with a cover letter, written by Mr. Crowe, that neglected to mention that Crowe had filtered State Street funds through his own bank account, or that he had reimbursed the Nelson Mullins employees for their contributions.  (*Id.* at ¶¶ 44, 46.)

4

On March 29, 2010, Ahmad awarded three of the four Global Custody Contracts to State Street, prompting State Street to increase its monthly retainer to Nelson Mullins and its monthly fee to Alo.  (*Id.* at ¶ 47.)

On April 26, 2010, Mr. Crowe held, but did not attend, a fundraiser for the Ohio Treasurer in Los Angeles, California.  (*Id.* at ¶ 48.)

In May and June of 2010, the news media raised questions of fraud based on State Street's having hired Alo, a friend of Ahmad, "just days before [State Street] was awarded the Global Custody Contracts."  (*Id.* at ¶ 49.)  Mr. Crowe called Ahmad about these allegations; Ahmad's response, "that the Treasurer's challenger was aggressive and well financed, and that 'this was just the beginning[,]'" apparently did not placate Mr. Crowe.  (*Id.* at ¶ 50.)  Mr. Crowe subsequently cancelled a fundraiser planned for June 1, 2010.  (*Id.*)

On June 30, 2010, DeBaggis executed the Global Custody Contracts, failing to mention the kickbacks to Ahmad or the campaign contributions filtered through Mr. Crowe's bank account, and certifying that "State Street had not, and would not, provide any public officials or employees with anything of value 'as to manifest a substantial and improper influence' with respect to that person's duties."  (*Id.* at ¶¶ 53-55.)

Because Ahmad remained concerned that Treasurer Boyce was lagging behind his challenger in campaign contributions, he demanded a meeting with DeBaggis and Mr. Crowe on July 12, 2010.  (*Id.* at ¶ 56.)  At the meeting, which only DeBaggis attended, Ahmad demanded further campaign contributions, and threatened rescission of the contracts "based on viable technical issues, or if the Treasurer's challenger were elected[.]"  (*Id.* at ¶¶ 57-58.)  DeBaggis called Mr. Crowe for help in meeting Ahmad's demands, which purportedly prompted a worried Mr. Crowe to send a "dummy invoice" to Alo for the $16,000 that Alo had previously wired to

him for "mentoring services."  (*Id.* at ¶¶ 60-61.)  The invoice was postmarked July 12, 2010, but

was dated February 15, 2010.  (*Id.* at ¶ 60.)  Mr. Crowe printed the invoice on Nelson Mullins

letterhead, yet Nelson Mullins had no knowledge of the mentoring contract, the invoice, or the

invoice's payment.  (*Id.* at ¶¶ 61-62.)

      Mr. Crowe allegedly never provided mentoring services to Alo.  (*Id.* at ¶ 63.)  Indeed,

Alo told the Federal Bureau of Investigation ("FBI") in November 2010 that "[Alo] had wired

the $16,000 into Crowe's bank account so that Crowe and DeBaggis could filter the money and

return it as campaign contributions."  (*Id.* at ¶ 64.)  Alo also explained to the FBI that, prior to

his interview with the FBI, Alo had asked Mr. Crowe what to say.  (*Id.*)  Mr. Crowe told Alo to

"stick to their story that Alo hired Crowe as a consultant."  (*Id.*)

      Meanwhile, DeBaggis threatened to take State Street's business away from Mr. Crowe if

he did not help deliver further campaign contributions to Treasurer Boyce's campaign.  (*Id.* at ¶¶

65-67.)  Mr. Crowe subsequently obtained a further $17,990 in contributions from Nelson

Mullins PACs and other personal contacts.  (*Id.* at ¶ 67.)

      All of these shenanigans were for naught: Treasurer Boyce lost the election on November

2, 2010, and the new treasurer fired State Street upon taking office.  (*Id.* at ¶ 68.)

**B.  Procedural History**

      The SEC filed suit in this Court on January 14, 2016, alleging that Mr. Crowe committed

the following federal securities violations:

> <u>Count I</u>: violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule
> 10b-5(a) and (c) thereunder (17 C.F.R. § 240.10b-5(a) and (c)), (Doc. 1 at ¶¶ 72-75);

> <u>Count II</u>: violations of Sections 17(a)(1) and (3) of the Securities Act (15 U.S.C. §
> 77q(a)(1) and (3)), (*id.* at ¶¶ 76-78.);

Count III: aiding and abetting State Street and DeBaggis's violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5(b) (17 C.F.R. § 240.10b-5(b)), (*id.* at ¶¶ 79-82.); and

Count IV: aiding and abetting State Street and DeBaggis's violations of Section 17(a)(2) of the Securities Act (15 U.S.C. § 77q(a)(2)), (*id.* at ¶¶ 83-86.)

In addition to seeking disgorgement and civil penalties, the SEC seeks permanently to enjoin Mr. Crowe from violating or aiding and abetting violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act. (*Id.* at 17-18.) On March 11, 2016, Mr. Crowe moved to dismiss the SEC's complaint under Rule 12(b)(6). (Doc. 6.) The motion is fully briefed and is ripe for review.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a cause of action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Thus, the Court "must construe the complaint in the light most favorable to the plaintiff" and "accept all well-pled factual allegations as true[.]" *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 790 (6th Cir. 2012). If more than one inference may be drawn from an allegation, the Court must resolve the conflict in favor of the plaintiff. *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). The Court cannot dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The allegations need not be detailed but must "give the defendant fair notice of what the claim is, and the grounds upon

7

which it rests." *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).  A complaint's factual allegations "must be enough to raise a right to relief above the speculative level," and must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  The Court is not required to accept as true mere legal conclusions unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because the SEC's claims sound in fraud, its complaint must also satisfy Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud … be stated with particularity." *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (citing Fed. R. Civ. P. 9(b)).  This particularity requirement "reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (internal quotation marks omitted).  To satisfy Rule 9(b), a plaintiff must "allege the time, place, and content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal citations omitted).

### III.  ANALYSIS

Mr. Crowe challenges the SEC's complaint, arguing: (A) that the SEC cannot bring its complaint under federal securities laws because it adopted a rule to address "pay to play" conduct which does not apply to Mr. Crowe; (B) that state (or federal) campaign finance laws, not federal securities laws, apply to Mr. Crowe's conduct, which requires this case to be tried in front of a state (or federal) elections tribunal; and (C) that the SEC has failed to state its federal securities law violations, because it failed adequately to allege (1) fraud "in connection with" a

securities transaction; and (2) scienter, as required for the SEC's aiding and abetting claims.  The Court will address each argument in turn.

## A.  Adviser's Act Rule 206(4)-5

Mr. Crowe first argues, correctly, that Adviser's Act Rule 206(4)-5 (17 C.F.R. § 275.206(4)-5), promulgated to "address 'pay to play' practices by investment advisers" (Political Contributions by Certain Investment Advisers, Investment Advisers Act Release No. IA3043, 75 FR 41018-01 (July 14, 2010)), does not apply to his alleged conduct in this case.  (Doc. 6 at 7-8.) Rule 206(4)-5 simply was not in effect during Mr. Crowe's involvement in the alleged pay-to-play scheme.  Political Contributions by Certain Investment Advisers, Investment Advisers Act Release No. IA3043, 75 FR 41018-01 (July 14, 2010).

The SEC is also correct, however, in pointing out that it did not bring this suit under Rule 206(4)-5.  (Doc. 8 at 9.)  Even assuming, as Mr. Crowe argues, that (a) Rule 206(4)-5 were in effect at the time of the alleged conduct, and (b) the rule does not apply to Mr. Crowe because neither he nor State Street is a registered investment adviser, Rule 206(4)-5 is not the exclusive vehicle by which the SEC can bring enforcement actions based on "pay to play" allegations. (*See* Doc. 8 at 10, collecting cases.)  "Pay to play" is not a term of art in federal securities laws, nor does the term appear in Rule 206(4)-5; rather, "pay to play" is a shorthand way to describe certain conduct—conduct which in this case is compared against the statutory and regulatory language of the federal securities laws.  Furthermore, it is not only "investment advisers," as defined by 15 U.S.C. § 80b-2(11), who fall within the ambit of the federal securities laws; indeed, Section 10(b), Rule 10b-5, and Section 17(a) reference "any person," not "any registered investment adviser."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a).  *See also Superintendent of Ins. of State of N. Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971).

Therefore, Rule 206(4)-5 is not relevant to the Court's determination of Mr. Crowe's Motion to Dismiss.

### B.  Campaign Finance Laws

Mr. Crowe next argues that federal court is not an appropriate forum for this case because the SEC alleged that he reimbursed colleagues' campaign contributions to the *state* treasurer's campaign "[i]n violation of federal and state campaign laws of which [Mr. Crowe] was aware[.]" (Doc. 1 at ¶ 45; Doc. 6 at 8-10; Doc. 10 at 3.)  He maintains that the SEC should have brought its case under Ohio campaign finance laws (specifically, Ohio Revised Code § 3517.102(B)(2)) before the Ohio Elections Commission.  (Doc. 6 at 9.)

The SEC responds that "jurisdiction over violations of Ohio campaign finance laws is beside the point."  (Doc. 8 at 10.)  Because the SEC brought its case under the federal securities laws, the SEC argues that its complaint should be tested in relation to the *those* laws.  (*Id.*)  The Court agrees.

The SEC did not bring this case under federal or state campaign finance laws.  The question for this Court is not whether the SEC chose the best laws to prosecute its case; rather, the Court must decide whether the SEC has stated a claim that Mr. Crowe violated the laws as alleged in the complaint—here, federal securities laws.  Mr. Crowe has presented no argument as to why the Ohio campaign finance laws he cited preempt federal securities laws, nor can the Court find any.[3]

---

[3] Notably, Mr. Crowe cites a statute (Ohio Rev. Code § 3517.102(B)(2)), the violation of which is *not*, as he contends, under the exclusive jurisdiction of the Ohio Elections Commission ("OEC").  (Doc. 6 at 9.) The laws over which the OEC retains exclusive jurisdiction are sections 3517.08 to 3517.13, 3517.17, 3517.18, 3517.20 to 3517.22, 3599.03, and 3599.031 of the Ohio Revised Code.  Ohio Rev. Code § 3517.151(A); Ohio Rev. Code § 3517.153(A); *State ex rel. Ohio Democratic Party v. Blackwell*, 855 N.E.2d 1188, 1192 (Ohio 2006).

*King Lincoln Bronzeville Neighborhood Ass'n v. Husted* is inapposite.  No. 2:06-CV-

00745, 2012 WL 395030, at *8 (S.D. Ohio Feb. 7, 2012) (Marbley, J.).  *King Lincoln* was a

voting rights and election fraud case; it did not deal with securities law.  *Id.* at *1.  This Court

dismissed the Amended Complaint in *King Lincoln* because the Eleventh Amendment to the

United States Constitution precluded subject matter jurisdiction.  *Id.* at *9.  In the segment of

*King Lincoln* cited by Mr. Crowe, the Court paraphrased a defendant's argument relating to the

appropriateness of deposing nonparties—members of the Chamber of Commerce ("CC")—in

support of claims that plaintiffs *did not make* in their Amended Complaint.  *Id.* at *8.  As noted

by Mr. Crowe, this Court did, indeed, find the defendant's argument compelling.  *Id.*  Had Mr.

Crowe continued quoting, however, he would have found the Court's own analysis, which makes

clear that its holding does not rest on "direct[ing] litigants to the Elections Commission for

campaign fraud issues[:]" (Doc. 6 at 9)

> Plaintiffs have not set forth any satisfactory factual or legal bases for deposing
> local CC members. Even if Plaintiffs could prove that local CC members were
> illegally coordinating campaign contributions to further an election fraud
> conspiracy taking place in Ohio, such a claim is unrelated to Plaintiffs' Amended
> Complaint.  *Id.*

In short, this Court did not allow the *King Lincoln* plaintiffs to take nonparty depositions because

such depositions did not relate to their amended complaint—a complaint which, in any event,

this Court dismissed.  *Id.* at *8-*9.

Because the Court must assess the SEC's complaint in relation to the federal securities

laws, and because the Ohio Elections Commission does not retain exclusive jurisdiction over

those laws, Mr. Crowe's jurisdictional argument is unavailing.

### C.  Federal Securities Laws

Under Section 10(b), it is "unlawful for any person…[t]o use or employ, in connection

with the purchase or sale of any security…any manipulative or deceptive device or

11

contrivance…[.]"  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b), and prohibits the

following conduct "in connection with the purchase or sale of any security[:]"

> Rule 10b-5(a) and (c) forbid "any person" from "employ[ing] any device, scheme, or artifice to defraud," or from "engag[ing] in any act, practice, or course of business which operates…as a fraud or deceit upon any person[.]"  17 C.F.R. § 240.10b-5(a) and (c).

> Rule 10b-5(b) prohibits "mak[ing] any untrue statement of a material fact or…[omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]"  17 C.F.R. § 240.10b-5(b).

Sections 17(a)(1)-(3) prohibit the same conduct as Rule 10b-5.[4]  15 U.S.C. §77q(a).

To establish a violation of Section 10(b), Rule 10b-5 or Section 17(a)(1), the SEC must

prove: (1) Mr. Crowe "engaged in misrepresentations or omissions" (2) "of material facts" (3)

"made in connection with the offer, sale or purchase of securities" (4) "with scienter[.]"  *Sec. &*

*Exc. Comm'n v. George*, 426 F.3d 786, 792 (6th Cir. 2005); *see also Aaron v. Sec. & Exc.*

*Comm'n*, 446 U.S. 680, 695-97 (1980).

A person may be held liable for aiding and abetting a securities violation "only if some

other party has committed a securities law violation, if the accused party had general awareness

that his role was part of an overall activity that is improper, and if the accused aider-abettor

knowingly and substantially assisted the violation."  *Sec. & Exc. Comm'n v. Washington Cnty.*,

676 F.2d 218, 224 (6th Cir. 1982)(quoting *Sec. & Exc. Comm'n v. Coffey*, 493 F.2d 1304, 1316

(6th Cir. 1974)).

---

[4]Rather than using the "in connection with the purchase or sale of any security" language of Section 10(b) and Rule 10b-5, Section 17(a) prohibits this conduct "in the offer or sale of any securities[.]"  Courts tend to overlook these slight differences.  *See, e.g.*, *Sec. & Exch. Comm'n v. Washington Cnty. Util. Dist.*, 676 F.2d 218, 225 (6th Cir. 1982) ("[I]t is axiomatic that, with regard to conduct affecting the sale of securities, Rule 10b-5(2) and Sec. 17(a)(2) are coterminous, except to the degree that proof of scienter is required by Rule 10b-5(2).")  Moreover, the parties do not argue that the phrases should be interpreted differently.  For the purpose of clarity, the Court will use the "in connection with the purchase or sale of any security" language of Section 10(b) and Rule 10b-5 to refer to both formulations.  Other minor distinctions between Rule 10b-5 and Section 17(a) are not at issue in this motion.

Mr. Crowe has challenged the sufficiency of all four counts of the SEC's complaint on the grounds that the SEC has failed adequately to allege the "in connection with the purchase or sale of any security" element of Section 10(b), Rule 10b-5, and Section 17(a). He challenged the aiding and abetting counts (Counts III and IV) on the grounds that the SEC has failed to allege the requisite scienter.

### 1. "In connection with the purchase or sale of any security"

In *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, the Supreme Court construed broadly the phrase "in connection with the purchase or sale" of securities. 547 U.S. 71, 85 (2006). The *Dabit* Court was interpreting this language in 15 U.S.C. § 78bb(f)(1), a part of the Exchange Act enacted after Section 10(b) and called the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").[5] *Id.* In looking to Section 10(b) and Rule 10b-5 cases for guidance in interpreting SLUSA's "in connection with" requirement, the Supreme Court observed the parallel language between 15 U.S.C. § 78bb(f)(1), Section 10(b), and Rule 10b-5, and noted, "[g]enerally, identical words used in different parts of the same statute are…presumed to have the same meaning." *Id.* at 86 (internal quotation omitted). Accordingly, to meet the "in connection with" element of the federal securities laws under *Dabit*, it is "enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else." *Id.* at 85. Supreme Court precedent also dictates that satisfying this element does not require, for example, "a misrepresentation about the value of a particular security," *Sec. & Exch. Comm'n v. Zandford*, 535 U.S. 813, 820 (2002), or "deception of an identifiable purchaser or seller," *Dabit*, 547 U.S. at 85 (quoting *United States v. O'Hagan*, 521 U.S. 642, 658 (1997)).

---

[5] The provision of SLUSA at issue in *Dabit* provides that federal law preempts certain class actions brought by private parties alleging "(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1).

The Supreme Court noted the rationale behind this broad interpretation in cases like *SEC v. Zandford*, 535 U.S. 813 (2002), and *Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6 (1971), explaining the need to construe Section 10(b) "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation omitted); *see also Bankers Life*, 404 U.S. at 12. Among Section 10(b)'s "remedial purposes" is to "insure honest securities markets and thereby promote investor confidence after the market crash of 1929." *Zandford*, 535 U.S. at 819 (quoting *O'Hagan*, 521 U.S. at 644) (internal quotation marks omitted); *see also Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1067 (2014). Put another way, "Congress sought to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Zandford*, 535 U.S. at 819 (internal quotations omitted). The Court must be careful, however, not to construe Section 10(b) "so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *Id.* at 820.

More recently, in *Chadbourne*, the Supreme Court interpreted the SLUSA phrase "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" as follows: "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" 134 S. Ct. at 1066 (quoting 15 U.S.C. § 78bb(f)(1)(A)). While *Dabit* interpreted "identical words" in SLUSA and Section 10(b),[6] *Chadbourne* did not. *Compare Dabit*, 547 U.S. at 86 (interpreting "'in connection with the purchase or sale' of securities") *with Chadbourne*, 134 S. Ct. at 1066

---

[6] As discussed *supra* at note 4, Section 17 has been interpreted to require the same "in connection with the purchase or sale of any security" element as Section 10(b) and Rule 10b-5.

(interpreting "misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security").  Section 78bb(f)(1)(A) of SLUSA parallels Rule 10b-5(b) in that it requires a material false statement or omission "in connection with the purchase or sale" of a security, yet it has little resemblance to the broader "device, scheme, or artifice to defraud" language of Rule 10b-5(a) and Section 17(a)(1), or the fraudulent "act [or transaction], practice, or course of business" of Rule 10b-5(c) and Section 17(a)(3).  Because Rule 10b-5(a) and (c), and Section 17(a)(1) and (3) (alleged in Counts I and II) require neither materiality nor a misrepresentation or omission, *Chadbourne* does not apply to Counts I or II.  17 C.F.R. §§ 240.10b-5(a) and (c); *see* 15 U.S.C. §§ 77q(a)(1) and (3); *see also Sec. & Exc. Comm'n v. Coffey*, 493 F.2d 1304, 1313-14 (6th Cir. 1974) (distinguishing between Section 17(a)(1) and (3) and Rule 10b-5(1) and (3) claims, on the one hand, and Section 17(a)(2) and Rule 10b-5(2) claims, on  the other); *Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 238 (S.D.N.Y. 2006), *aff'd*, 216 F. App'x 14 (2d Cir. 2007) ("Though often conflated with subparagraph (b), the more general provisions of subparagraphs (a) and (c) of Rule 10b–5 do not require a misstatement or omission."); *Sec. & Exc. Comm'n v. Santos*, 355 F. Supp. 2d 917, 919 (N.D. Ill. 2003) (participation in a "scheme to defraud" sufficient to satisfy Rule 10b–5(a) and (c)).

The Court will analyze Counts III and IV under *Chadbourne*.  Counts I and II are not controlled by *Chadbourne* and thus belong under the framework of *Dabit*.

### a.  *Counts III and IV*

In Counts III and IV, the SEC alleged that Mr. Crowe aided and abetted State Street and DeBaggis in violating Section 10(b) and Rule 10b-5(2) (Count III), and Section 17(a)(2) (Count IV).  (Compl., Doc. 1, at ¶¶ 79-86.)  Proof of these aiding and abetting claims requires: (1) that State Street and DeBaggis "committed a securities law violation;" (2) that Mr. Crowe had

"general awareness that his role was part of an overall activity that is improper;" and (3) that Mr. Crowe "knowingly and substantially assisted the violation."  *Washington Cnty*, 676 F.2d at 224 (internal quotation omitted).  To prove that State Street and DeBaggis violated Section 10(b), Rule 10b-5(2), and Section 17(a)(2), the SEC must show "(1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale or purchase of securities (3) with scienter[.]"  *George*, 426 F.3d at 792.  Mr. Crowe does not challenge the allegations that State Street and DeBaggis made misrepresentations or omissions of material facts, with scienter (*see* Doc. 6 at 14); he challenges only whether those misrepresentations or omissions occurred "in connection with" an offer, sale, or purchase of securities.[7]

Under *Chadbourne*, "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"  134 S. Ct. at 1066.  The "connection" must "matter"—under the facts of *Chadbourne*, this meant that the misrepresentation "ma[de] a significant difference to someone's decision to purchase or to sell a covered security[.]"  *Id.*

Mr. Crowe argues that the SEC cannot meet this standard.  In "the best case for the SEC," Mr. Crowe argues, "the alleged misrepresentations were … made to facilitate State Street's receipt of contracts to be a 'subcustodian service provider.'"  (Doc. 6 at 11.)  Because this Subcustodian provided "ministerial" services rather than discretionary brokerage services, Mr. Crowe argues, State Street and DeBaggis's conduct does not make the requisite connection.[8] (*Id.*)

---

[7] Since *Chadbourne* does not apply to Counts I and II, Mr. Crowe's own alleged fraud need not be material to "a decision to purchase or sell a security[.]"  (*See* Doc. 6 at 15.)
[8] Mr. Crowe argues that this is true even if the services are "integral" to effectuating securities transactions.  (Doc. 6 at 14.)

The SEC responds that the Subcustodian provides services that are "inextricably intertwined and integral to facilitating and effecting transactions in securities on behalf of the pension funds[:]" "safeguard[ing] assets, provid[ing] recordkeeping services, accept[ing] and deliver[ing] cash and securities, and effect[ing] settlement of the funds' securities transactions" in addition to "invest[ing] the pension funds' cash balances by purchasing short-term investment securities."  (Doc. 8 at 12.)

The SEC's argument that custodians have no less "connection" to securities transactions than broker-dealers is bolstered by the definition of "broker" under the Exchange Act.  (Doc. 8 at 13.)  The Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."  15 U.S.C. § 78c(4)(A).  "[T]ransactions in securities," means, of course, buying and selling securities.  The exception for banks engaged in "safekeeping or custody services," 15 U.S.C. § 78c(4)(B)(viii), would not be necessary if such services were not otherwise "effecting transactions in securities for the account of others."  The Court finds this argument persuasive.  The custodial services that State Street provides are sufficient to satisfy the required nexus with securities transactions.

Whether the choice of Subcustodian is "material to a decision to purchase or sell" securities, however, is a more difficult question.  Mr. Crowe argues that this choice cannot be "material to a decision to purchase or sell" securities because: (a) subcustodian services are ministerial rather than discretionary (Doc. 6 at 11; Doc. 10 at 7); and (b) because "a misrepresentation that would only *influence an individual's choice of broker-dealers*[,]" rather than his choice of securities, cannot be material to anyone's decision to purchase or sell securities.  (Doc. 6 at 11-12, 14; Doc. 10 at 8) (emphasis added.)[9]

---

[9] Mr. Crowe suggests that some courts have found exceptions to this "settled" principle when the broker selected is given "*discretionary* trading power, meaning that the broker is entitled to make investment

The SEC takes the position that the conflict of interest created by "incentivizing the Treasurer's office to favor State Street even though other custodians might have better served the pension funds"[10] and the integrity of the selection process were "unquestionably material to the selection and retention of the subcustodian."  (Doc. 8 at 15.)

The parties disagree over the import of the Eleventh Circuit case *SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012).  In *Goble*, the defendant made a sham accounting entry that misrepresented the financial condition of his company (a securities and clearing brokerage firm) and allowed him to take $3.4 million out of a reserve account to alleviate the company's downward spiral.  *Id.* at 941.  The SEC argued that this misrepresentation was material because investors would have chosen a different brokerage firm to process their transactions had they known of the company's financial condition.  *Id.* at 943.  The Eleventh Circuit disagreed, holding that "an individual's choice of broker-dealers cannot form the basis for § 10(b) securities fraud liability."  *Id.* at 944.

Mr. Crowe focuses on *Goble*'s holding.  (Doc. 6 at 11; Doc. 10 at 8.)  The SEC contends that *Goble* "is best understood as a reaction to the unusual facts of that case[.]"  (Doc. 8 at 17.)  According to the SEC, "the facts of [Crowe] involve a far more direct nexus to the purchase and sale of securities" than an accounting sleight of hand that touched no investor.  (*Id.*)  Finally, the SEC argues that *Goble* is not binding on this Court, and *Goble* also did not consider contrary precedents established by other courts.  (*Id.*)

---

decisions."  (Doc. 6 at 13.)  Mr. Crowe sorts these cases into two types: (1) when a court defines such a discretionary brokerage account as an "investment contract" under the securities laws; and (2) when "the choice of broker is tantamount to the choice of securities."  (*Id.*) (internal quotation omitted).

[10] Mr. Crowe's argument that State Street did, *in fact*, have the lowest bids, (Doc. 6 at 5) is a question of fact inappropriate for determination at the motion to dismiss stage.  Moreover, the SEC need not prove loss in an enforcement action.  *Sec. & Exch. Comm'n v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985) ("Unlike private litigants seeking damages, the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money.")

Because *Goble* is not binding on this Court, and because the "in connection with" inquiry is fact-intensive, the Court must compare the competing precedents.  The Court finds that the conduct assessed in the SEC's cited cases is far closer to the conduct at issue in this case.  *See*, *e.g.*, *Vernazza v. Sec. & Exch. Comm'n*, 327 F.3d 851, 859 (9th Cir. 2003), *amended*, 335 F.3d 1096 (9th Cir. 2003) ("It is indisputable that potential conflicts of interest are 'material' facts with respect to clients and the Commission."); *Sec. & Exch. Comm'n v. Softpoint, Inc.*, 958 F. Supp. 846, 863 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998) (payments resembling kickback agreement are material); *S.E.C. v. Feminella*, 947 F. Supp. 722, 732 (S.D.N.Y. 1996) (alleged kickback scheme is in connection with a purchase of securities); *In the Matter of Guy P. Riordan*, Release No. 9085, 2009 WL 4731397, at *n.46 (Dec. 11, 2009) ("Riordan's secret kickback payments to Montoya constituted material information because, at a minimum, such an arrangement could cause a reasonable investor, in this case, the State, to question the quality of NMSTO's management and integrity of its bidding process for securities transactions.") (collecting cases).

*Goble*, and the other cases Mr. Crowe cites in support of his argument that a misrepresentation affecting a choice of broker is not securities fraud, are dissimilar to this case. *See*, *e.g.*, *French v. First Union Sec., Inc.*, 209 F. Supp. 2d 818, 828 (M.D. Tenn. 2002) (misrepresentation regarding a broker's qualifications or investment strategy); *Capalbo v. Paine Webber, Inc.*, 672 F. Supp. 1048, 1052 (N.D. Ill. 1987) (misrepresentations "relate to the establishment, functioning, and status of the brokerage accounts"); *Siegel v. Tucker, Anthony & R.L. Day, Inc.*, 658 F. Supp. 550, 553 (S.D.N.Y. 1987) (false promise of "conservative stewardship" of brokerage account); *Darrell V. Goodson*, No. 78 CIV. 5945, 1980 WL 1392, at *2 (S.D.N.Y. Apr. 10, 1980) ("most indefinite promises of conservative management"); *Troyer*

19

*v. Karcagi*, 476 F. Supp. 1142, 1148 (S.D.N.Y. 1979) ("misstatement or omission occurred after [plaintiff's] purchase").

The Court notes that the parties' cited cases are invariably pre-*Chadbourne*.  While post-*Chadbourne* cases are inapposite, the Court finds two such cases helpful in applying *Chadbourne* in the context of this case.  In *Lim v. Charles Schwab & Co*., Charles Schwab provided "trade execution services" to plaintiffs.  No. 15-CV-02074-RS, 2015 WL 7996475, at *7 (N.D. Cal. Dec. 7, 2015).  These "trade execution services" bore some resemblance to custodial services: customers placed their own securities trade orders, and Schwab executed them.  *Id.* at *1.  Like State Street, Schwab did not make discretionary trades.  *Id.*  A Schwab customer could even choose the *route* its order took, and transaction fees varied depending on an order's route, or "trading venue."  *Id.* at *1-*2.  When a customer did not choose a particular trading venue, Schwab was contractually obligated to route nearly all of its orders through UBS bank.  *Id.* at *2.  Plaintiffs argued that Schwab had made a false promise to route their trades not through UBS, but through "the trading venue that w[ould] secure the most favorable prices for the customer[.]"  *Id.* at *1.  The Northern District of California found this fraud to be "material to a decision to buy or sell a security" under *Chadbourne* because the false promise to obtain the best price was "(1) directed at Schwab's clients (2) in order to induce them to purchase or sell securities through Schwab for a fee, and (3) caused losses directly resulting from what clients believed to be legitimate securities transactions."  *Id.* at *7.

So too here.  Because of the fraud alleged in the SEC's complaint, Ohio's pension funds were told that State Street would be the most favorable custodian and executer of their securities

transactions.  (*See* Compl., Doc. 1, at ¶¶ 8, 30.)  This allegedly false promise, then, caused the pension funds to buy and sell through State Street.[11]  As the Court in *Lim* explained,

> even if Schwab's deceptive conduct [wa]s an inducement intended to cause customers to choose Schwab over competing brokers, that would not mean Schwab's misrepresentations were other than "in connection with" securities transactions; rather, the false promise that customers will receive the best price for their trades is material to *every* decision to purchase or sell a security through Schwab.

*Lin*, 2015 WL 7996475, at *7.  Here, the false promise that State Street was the best venue for the pension funds' trades is equally material to the pension funds' decision to purchase or sell securities through State Street.

The court in *Zola v. TD Ameritrade, Inc.* confronted similar facts and came to the same conclusion.  2016 WL 1170979, *2-*3, *10-*11 (D. Neb. March 23, 2016), *appeal dismissed* (May 18, 2016).  The *Zola* plaintiffs brought class actions under state law and federal securities law alleging that TD Ameritrade routed plaintiffs' stock trading orders through trading venues beneficial to TD Ameritrade rather than to plaintiffs.  *Id.* at *10.  In holding the state law claims to be preempted by SLUSA, which was "designed to prevent plaintiffs from migrating to state court…to evade rules for [private] federal securities litigation[,]" the court found that "undisclosed conflicts of interest and omissions of material fact… are 'in connection with' the purchase and sale of securities for SLUSA purposes."  *Id.*

In light of this discussion, the Court finds that the SEC met the "in connection with" element of its aiding and abetting claims (Counts III and IV).

### b.  Counts I and II

The SEC alleges that Mr. Crowe participated in a "corrupt scheme to influence the Treasurer's office to select and retain State Street as the subcustodian" by "repeatedly caus[ing]

---

[11] The SEC need not prove loss in an enforcement action.  *Sec. & Exch. Comm'n v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985).

concealed campaign contributions to be made on behalf of State Street to the Treasurer[.]"
(Compl., Doc. 1 at ¶ 5; Doc. 8 at 12.)  If the scheme "'coincides' with a securities transaction—
"whether by the plaintiff or by someone else[,]" then it satisfies the "in connection with" element
of Section 10(b), Rule 10b-5(a) and (c), and Section 17(a)(1) and (3).  *Dabit*, 547 U.S. at 85.

The SEC argues that it adequately alleged Mr. Crowe's fraud to have "coincided" with
the purchase or sale of securities because the fraud involved influencing the Treasurer's choice
of Subcustodian.  (Doc. 8 at 12.)  For the same reasons set forth in detail in section (C)(1)(a),
*supra*, Mr. Crowe disagrees.

In determining whether the fraudulent scheme alleged "coincides" with the purchase or
sale of a security, the Court finds *SEC v. Santos* instructive.  355 F. Supp. 2d 917 (N.D. Ill.
2003).  In *Santos*, the Chicago treasurer was in charge of $2.5 billion in city funds, which she
was to cause to be invested through a competitive bidding process.  *Id.* at 918.  The treasurer
"demanded illegal cash payments and campaign donations from [broker-dealers] in exchange for
the city's investment business."  *Id.* at 919.  The Northern District of Illinois found this alleged
fraudulent payment scheme—kickbacks and campaign donations for public business—to
"directly coincide[] with the security transactions made on behalf of the city."  *Id*. at 920.

*Santos* bears a very close relation to this case.  It is of no moment that the *Santos* Court
assessed a scheme of campaign contributions and kickbacks in exchange for brokerage (rather
than custodial) services; this Court already found that State Street's role as Subcustodian bears
an adequate connection to the purchase or sale of securities.  *Supra*, sec. (C)(1)(a).

The Court finds that the complaint properly alleges that the scheme was "in connection
with" the purchase and sale of securities.

## 2.  Scienter

Counts III and IV allege that Mr. Crowe aided and abetted the securities violations of State Street and DeBaggis.  The elements of these aiding and abetting claims are: (1) whether State Street and Mr. DeBaggis "committed a securities law violation;" (2) whether Mr. Crowe had "general awareness that his role was part of an overall activity that is improper;" and (3) whether Mr. Crowe "knowingly and substantially assisted the violation."  *Washington Cnty*, 676 F.2d at 224.  Because the parties' arguments are limited to the second aiding and abetting factor, the Court will so limit its analysis.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[C]ourts are generally limited to addressing the claims and arguments advanced by the parties.")

Mr. Crowe argues that the SEC did not allege that he read, or was aware of the content of, the Global Custody Contracts containing State Street and DeBaggis's alleged misrepresentations.  (Doc. 6 at 15-16; Doc. 10 at 10-12.)  It follows, according to Mr. Crowe, that the SEC failed to adequately allege scienter, and Counts III and IV must fall.  (Doc. 6 at 15-16; Doc. 10 at 12.)

The SEC responds that it has adequately pled Mr. Crowe's scienter by alleging: (a) that Mr. Crowe "caused State Street's illegal payments to the Treasurer's campaign" (Doc. 8 at 20); (b) that he "had direct knowledge that State Street was using kickbacks and the illegal payments to influence the Treasurer's office to select and retain State Street as the subcustodian" (*id.*); and (c) that he "was involved in at least three different efforts to cover his tracks[.]"  (*Id.*)

To determine whether Mr. Crowe had "general awareness that his role was part of an overall activity that is improper," the Court notes that "the surrounding circumstances and expectations of the parties are critical.  If the alleged aider and abettor conducts what appears to

23

be a transaction in the ordinary course of his business, more evidence of his complicity is

essential. … Conversely, if the alleged aider and abettor conducts a transaction of an

extraordinary nature, less evidence of his complicity is necessary." *Washington Cnty*, 676 F.2d

at 224, 226 (quotation omitted).  Sixth Circuit precedent does not require the SEC to prove that

Mr. Crowe had actual knowledge of the violations; a showing of recklessness in not knowing

about the violations will suffice.  *See Sec. & Exc. Comm'n. v. Geswein*, 2 F. Supp. 3d 1074, 1081

(N.D. Ohio 2014) (analyzing and collecting cases).  In this context, recklessness is "highly

unreasonable conduct which is an extreme departure from the standards of ordinary care."

*George*, 426 F.3d at 792 (quoting *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025

(6th Cir. 1979)).

 For the purpose of a motion to dismiss, the SEC has met its burden to show that Mr.

Crowe had "general awareness that his role was part of an overall activity that is improper[.]"

*Washington Cnty*, 676 F.2d at 224.  Filtering illegal payments to Treasurer Boyce's campaign

through his own bank account, and reimbursing campaign donations, if true, constitutes

"extraordinary" conduct requiring "less evidence of his complicity."  *See id.* at 226 (quotation

omitted).  In *Washington County*, the defendant's alleged extraordinary conduct, paired with

allegations that he was aware that his actions (receiving kickbacks) were improper and he took

pains to cover his tracks, was sufficient evidence of "general awareness."  *Id.*  So too here.  Mr.

Crowe's extraordinary conduct, particularly in light of the fact that he is an experienced

fundraiser, paired with allegations that he knew that State Street and DeBaggis were improperly

using illegal campaign contributions and kickbacks in exchange for state business, he was aware

that his actions in facilitating the illegal campaign contributions were improper, and he took

24

pains to cover his tracks, constitutes sufficient evidence of "general awareness" to survive a motion to dismiss.

*SEC v. Conaway* lends further support to this conclusion.  No. 05-40263, 2006 WL 2828569 (E.D. Mich. 2006).  In *Conaway*, the court refused to dismiss an aiding and abetting claim against a CEO involved in a fraudulent scheme and a cover-up but not the preparation of the particular document containing the alleged misrepresentations.  *Id.* at *6-*7.  The allegations in *Conaway* required an inference that CEO Conaway, allegedly aware of a mistake affecting his company's financial position, and allegedly involved in crafting a cover story for investors interested in knowing that financial position, would know that the result of the mistake and cover-up would be a misrepresentation to investors.  *Id.* at *7.

Mr. Crowe, too, was allegedly deeply involved in a scheme to obtain business illegally from the State of Ohio, yet he was not alleged to have seen the false "no improper influence" certifications themselves.  Mr. Crowe allegedly knew the object of the scheme, funneled funds in a manner that could not be business as usual, created a "dummy invoice," and instructed Alo to tell a cover story to the FBI.  (Compl., Doc. 1., at ¶¶ 5, 60-61, 64).  It is not unreasonable to infer that Mr. Crowe, as an attorney "active in government and political affairs for most of his career…, a skillful fundraiser who served as National Finance Co-Chair for the John Kerry campaign in 2004 and [as] Vice Chair for Finance at the Democratic National Committee" (Doc. 6 at 1), would be familiar with the campaign contribution ramifications of seeking government business and the "no improper influence" certifications required to enter into government contracts.  *See Conaway*, 2006 WL 2828569, at *7.  The primary concern of campaign finance laws, of which a skilled fundraiser would be well aware, is indeed improper influence.

## IV. CONCLUSION

For these reasons, Mr. Crowe's Motion to Dismiss (Doc. 6) is **DENIED.**

**IT IS SO ORDERED.**

      **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: October 20, 2016**